Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence, or to rehear the parties or their representatives, the full Commission upon reconsideration of the evidence MODIFIES AND AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in the Form 21 Agreement as:
 STIPULATIONS
1. On the date of plaintiff's alleged injury, April 15, 1995, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. Defendant is an approved self-insured, with Liberty Mutual Insurance Company acting as the servicing agent of its workers' compensation insurance coverage at all the relevant times herein.
4. Plaintiff sustained an injury by accident or contracted an occupational disease arising out of and in he course of employment with defendant and that disability began on May 24, 1995.
5. Plaintiff's average weekly wage was $410.00 per week at all relevant times herein.
6. The issues to be determined by the Commission are as follows:
 a. Whether plaintiff sustained an injury to her shoulder and neck as a result of the accident on April 15, 1995, while in the course and scope of her employment with defendant-employer?
 b. Whether plaintiff has developed fibromyalgia and psychological problems as a result of her accidental injury of April 15, 1995?
 c. If so, what, if any, benefits is plaintiff entitled to receive?
***********
Based upon the competent evidence of record herein, the Full Commission modifies the findings of fact by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. On or about August 15, 1995, the parties entered into a Form 21 Agreement wherein the parties stipulated that plaintiff sustained an injury by accident or contracted an occupational disease arising out of and in the course and scope of her employment with defendant. The parties also agreed that plaintiff contracted tendonitis in her left shoulder and arm; that her average weekly wage at the time of her disability was $410.00 per week, subject to verification, yielding a compensation rate of $273.35; that her disability began on May 24, 1995; that she returned to work May 31, 1995, and that compensation was due beginning July 3, 1995, and continuing for necessary weeks. The Form 21 Agreement was approved by the Industrial Commission on November 8, 1995.
2. Plaintiff's date of birth is April 24, 1947. Plaintiff worked as a sewer of leather furniture upholstery for defendant continuously from late October, 1994 until her work-related injury April 15, 1995. She had previously worked for defendant for about fifteen months.
3. Plaintiff had been a sewer for thirty years. Plaintiff's job with defendant required the repetitive use of both hands and arms to grip, push and pull leather being sewn. On a typical day, plaintiff would sew seventy-five pieces of leather to be used in the covering of executive chairs. She was required to work with her arms at shoulder height for several hours.
4. On or about April 15, 1995, while plaintiff was sewing leather, she elevated her left arm in order to pull a strip of leather and felt a "popping" sensation in her left shoulder and neck area. Shortly after this incident, plaintiff began to experience a great deal of pain in her left shoulder, extending up into the trapezium and the left side of her neck. This is the medical history plaintiff gave Drs. Alfred Geissele, John dePerczel, Mark Faruque, and Dennis Payne.
5. On May 2, 1995 plaintiff was examined by the company physician, Dr. Mark Faruque at Harts Industrial Clinic and diagnosed with a rotator cuff strain and tendonitis/adhesive capsulitis of the left shoulder. Dr. Faruque initially treated plaintiff with medication and physical therapy, then later gave her a corticosteroid injection to the left shoulder. When plaintiff failed to improve after the course of treatment provided by Dr. Faruque, he referred her to Dr. John L. dePerczel, an orthopaedic surgeon.
6. Plaintiff presented to Dr. dePerczel on May 26, 1995, complaining of severe pain in her left shoulder, headaches, loss of sleep at night due to pain, and numbness and tingling along the C-6 distribution, extending to the thumb and index finger of her left hand. Dr. dePerczel made three tentative diagnoses: (1) strain of the left neck and shoulder; (2) tendonitis in the left neck and shoulder; and/or (3) mild carpal tunnel syndrome. He informed plaintiff that she might have a slipped disc irritating the nerve and that he did not recommend she undergo surgery for her mild carpal tunnel syndrome.
7. Dr. dePerczel took plaintiff out of work May 26, 1995 and continued to treat her with medication and physical therapy. Plaintiff was allowed to returned to work May 30, 1995 on a restricted basis. Plaintiff was advised to avoid any vigorous use of the right arm. Thereafter, plaintiff was unable to work during several periods through July 24, 1995. Plaintiff worked from July 24, 1995 until August 29, 1995 when she was taken out of work by Dr. dePerczel because her condition had deteriorated and she had begun to show signs of C-6 numbness and was experiencing dysesthesia into the left hand. Plaintiff has not worked since August 29, 1995.
8. When plaintiff failed to respond to Dr. dePerczel's course of treatment, he referred her to Dr. Alfred E. Geissele. On November 14, 1995 plaintiff presented to Dr. Geissele complaining of headaches and left upper extremity pain paralleling what would be the C-6 nerve root distribution. Dr. Geissele tried to differentiate how much of the pain came from the shoulder versus plaintiff's neck. Dr. Geissele placed plaintiff on anti-inflammatory medication and discussed with her surgery to decompress her C-6 nerve root.
9. Dr. Geissele diagnosed plaintiff as having a C-5/C-6 disk herniation, C-6 radiculitis due to her C-5/C-6 disk herniation, and subacromial impingement syndrome in her left shoulder, caused or aggravated by trauma, and possibly caused by and probably aggravated by plaintiff's "incident at work" in April, 1995.
10. On November 27, 1995, Dr. Geissele performed surgery to fuse two vertebrae and correct plaintiff's C-5/C-6 disk herniation. Thereafter, he referred her for some rehabilitation. The parties stipulated that the cervical fusion surgery was authorized by the carrier. Plaintiff responded well initially, but thereafter her condition again began to deteriorate. A repeat injection into the shoulder was of little benefit. Plaintiff underwent more physical therapy and had an MRI done. No clear abnormalities were discovered in the shoulder, but plaintiff was noted to have problems with pain and stiffness in the neck and the cervical MRI revealed degenerative disease of the disks and cervical spine.
11. On March 22, 1996, plaintiff presented to Dr. Sarah Peters, a psychiatrist at the Hickory Psychiatric Center, suffering from anxiety and depression. She complained of the following symptoms: low energy, inability to sleep, loss of interest in things, constant pain, inability to raise shoulder or arm, numbness in both arms and legs, feelings of helplessness and worthlessness, occasional feelings of shakiness, difficulty in breathing, headaches, nausea, and occasional feelings that life is not worth living.
12. Dr. Peters diagnosed plaintiff as suffering from chronic pain and major recurrent depression caused by the stresses arising from pain, her inability to work due to not being able to use her left arm, and lack of rest and sleep. Dr. Peters prescribed psychotherapy, relaxation techniques, and biofeedback.
13. On May 15, 1996, Dr. Geissele found plaintiff to have reached maximum medical improvement for her neck condition and assigned plaintiff a ten percent (10%) permanent partial disability rating to her neck (back). Although plaintiff had reached maximum medical improvement for her neck condition, she was not physically able to work due to her shoulder problems. Plaintiff subsequently developed recurrent discomfort in the base of her neck and pain in the bone graft donor site that was used to fuse the neck. Dr. Geissele referred plaintiff back to Dr. dePerczel who performed surgery on plaintiff's left shoulder in July, 1996 to repair plaintiff's rotator cuff tear. However, this surgery revealed that plaintiff had a labral tear rather than a rotator cuff tear. Plaintiff initially responded well after surgery, but her condition soon began to deteriorate again thereafter.
14. Dr. Geissele later changed his rating from ten percent (10%) to a twenty-five percent (25%) permanent partial disability rating to plaintiff's back based on "recurring symptoms and dysfunction". Dr. Geissele said that he would recommend lifelong follow-up to monitor plaintiff's condition resulting from her surgery and medication, and to oversee her extended type of therapy.
15. On October 3, 1996, Dr. dePerczel assigned plaintiff a fifteen percent (15%) permanent partial disability rating of the left hand because of carpal tunnel syndrome and a fifteen percent (15%) permanent partial disability rating of the left arm because of her shoulder problem.
16. Dr. dePerczel was of the opinion that the repetitive motion required by plaintiff's job as a sewer could have caused or materially aggravated plaintiff's tendonitis, labral tear of the left shoulder, impingement syndrome and carpal tunnel syndrome, and that her job placed her at an increased risk over the general public of contracting tendonitis, impingement syndrome and labral tear of the left shoulder, and carpal tunnel syndrome. He further opined that plaintiff's strain of the neck and left shoulder resulting from the April 15, 1995 work incident caused a cervical disk herniation on the left side. Dr. dePerczel was of the opinion that plaintiff's job with defendant could have caused or materially aggravated her injuries. He restricted plaintiff on a permanent basis to avoid repetitive wrist and hand motion because of her carpal tunnel syndrome problem, to avoid overhead work with her left arm, and to not push, pull, lift or carry with her left arm.
17. Neither Dr. dePerczel nor any other medical expert has distinguished plaintiff's disability arising from her carpal tunnel syndrome from her disability caused by her neck and shoulder problems because the conditions are too intertwined to separate.
18. Plaintiff has failed to prove that her fibromyalgia diagnosed by Dr. D. Dennis Payne, a rheumatologist, is related to her work with defendant.
19. Plaintiff's depression and chronic pain are causally related to her work.
20. On April 15, 1995 plaintiff sustained an injury to her neck due to a specific traumatic incident arising out of and in the course of her employment. The specific traumatic incident of April 15, 1995 either caused or materially aggravated plaintiff's C-5/C-6 disk herniation and C-6 radiculitis.
21. Plaintiff's job as a leather upholstery sewer significantly contributed to the development of, or significantly aggravated her carpal tunnel syndrome, tendonitis and labral tear of the left shoulder. Plaintiff's job as a leather sewer placed her at an increased risk over the general public of contracting carpal tunnel syndrome, tendonitis and the labral tear.
22. Plaintiff never listed carpal tunnel syndrome as a condition for which compensation was sought. Therefore, the defendant never received any notice that plaintiff was seeking workers' compensation benefits for carpal tunnel syndrome. Defendant was prejudiced by plaintiff's failure to give notice.
23. Plaintiff has not reached maximum medical improvement from all of her conditions caused by her compensable injury and occupational diseases.
24. Plaintiff has unsuccessfully attempted to return to work on several occasions. She remains out of work and continues to receive workers' compensation benefits.
25. Defendants have denied that plaintiff's conditions, other than her shoulder problems, resulted from her employment or her April 15, 1995 injury. However, plaintiff's treating doctors are of the opinion that her conditions, except fibromyalgia, flowed directly from her injury of April 15, 1995, or from compensable occupational diseases. Because some of the conditions for which plaintiff is seeking compensation were not specifically admitted in the Form 21 Agreement, defendant was justified in defending this claim.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In that defendant accepted as compensable plaintiff's injury/occupational disease of her left shoulder and arm on April 15, 1995 through a Form 21 Agreement, defendant cannot now deny liability for these conditions. Plaintiff has been diagnosed with tendonitis of the left shoulder, C-5/C-6 disk herniation, C-6 radiculitis, subacromial impingement syndrome in her left shoulder, adhesive capsulitis of the left shoulder, labral tear of left shoulder, chromic pain, and major depression. Plaintiff's job with defendant significantly contributed to the development of or materially aggravated her left shoulder subacromial impingement syndrome, adhesive capsulitis, and labral tear of the left shoulder. Plaintiff's job also placed her at an increased risk over the general public of contracting her left shoulder problems. N.C. Gen. Stat. § 97-2; 53(13).
2. Plaintiff's work-related specific traumatic incident of April 15, 1995 either caused the C-5/C-6 disk herniation and C-6 radiculitis or materially aggravated these pre-existing conditions and is therefore a compensable injury by accident arising out of and in the course of employment. N.C. Gen. Stat. § 97-2(6).
3. Defendant was prejudiced by plaintiff's failure to give notice of a claim for carpal tunnel syndrome. Therefore, any claim plaintiff may have for carpal tunnel syndrome is barred.
4. Plaintiff's fibromyalgia is not work related.
5. Plaintiff's disabling chronic pain and major depression flowed directly from her work-related injury and occupation diseases.
6. Plaintiff is entitled to receive temporary total disability benefits at the rate of $273.35 per week from the time she was taken out of work beginning August 29, 1995 through the date of the hearing before the Deputy Commissioner and continuing until further order of the Industrial Commission. N.C. Gen. Stat. §97-29.
7. Plaintiff is entitled to the payment of the medical expenses incurred or to be incurred for all reasonably necessary treatment arising from her April 15, 1995 injury and from her work-related occupational diseases.
8. Defendant is not obligated to pay medical expenses relating to plaintiff's treatment for carpal tunnel syndrome and fybromyalgia. N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fees hereinafter awarded, defendant shall to pay to plaintiff temporary total disability benefits at the rate of $273.35 per week from August 29, 1995 through the date of hearing before the Deputy Commissioner and continuing until further order of the Commission.
2. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of any lump sum due plaintiff shall be deducted and paid directly to counsel; and, thereafter, plaintiff's counsel shall receive every fourth check.
3. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injuries or occupational diseases when bills for same have been submitted and approved through procedures adopted by the Commission.
4. Defendant shall pay the costs of this action.
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ LAURA K. MAVRETIC COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER